

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH L. PLESHA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 6602 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Deborah L. Plesha ("Plaintiff"), seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying

her disability insurance benefits ("DIB"). Before this Court is Plaintiff's Motion for

Summary Judgment or Remand. The parties have consented to have this Court conduct any

and all proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C.

§ 636(c) and Local Rule 73.1(c). For the reasons set forth below, this Court affirms the

Commissioner's decision in part, reverses in part, and remands the case for further

proceedings consistent with this opinion.

### I.   Procedural History

Plaintiff filed an application for a Period of Disability and Disability benefits and

Supplemental Security Income on January 7, 2005. (R. at 18, 37-42, 63.) She alleged that she had

a disability that began on October 1, 2002. (R. 38, 39, 63.) The Social Security Commission

denied her claim on September 19, 2005, and again on January 6, 2006, after Plaintiff had asked for reconsideration. (R. at 18, 44-7, 53-7.)

After being denied again, Plaintiff filed a timely request for a hearing on January 26, 2006. (R. 18, 43.) The hearing took place on October 10, 2006, before Administrative Law Judge Paul Armstrong (the "ALJ"), during which Plaintiff's (previous) counsel amended her disability onset date to February 3, 2004. (R. at 18, 381.) On March 29, 2007, the ALJ found that Plaintiff was not disabled and denied her claim for benefits. (R. at 15-25.) Not one to lose hope, Plaintiff filed a timely Request for Review of the hearing decision with the Social Security Administration's ("SSA") Appeals Council (the "Appeals Council"). (R. at 7-10.) When the Appeals Council denied her appeal on August 21, 2007, (R. 7-10), the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981. After the Appeals Council granted Plaintiff an extension of time to file a civil action, Plaintiff filed the action before this Court on November 21, 2007. (R. 4-6).

## II.  **Background**

### A.  **Plaintiff's Background**

Plaintiff was born on December 11, 1969, and was 32 years old at the onset of her alleged disability. (R. at 20, 63.) She was 5'8" tall and weighed between 240 and 260 pounds at the time of the hearing (R. at 76, 392) but recently had lost 40 pounds (R. at 400). Although Plaintiff completed only the 10th grade, she has a General Educational Development ("GED") credential. (R. at 81, 410.) Additionally, she has been unemployed since February 3, 2004. (R. at 93.) In the

past, however, she worked as an office clerk, an accounting clerk, a bookkeeper, and a customer service representative. (R. at 93.)

**B.    Medical Treatment and Opinions**

1.    Treatment from Doctor Oken

In 2003, Plaintiff injured herself in an automobile accident. After the accident, on April 28, 2004, Plaintiff consulted Doctor Oken ("Dr. Oken"). (R. at 214-15.) He reported that her standing time was "about an hour," and that she could "participate in basic [Activities of Daily Living ("ADL's")] as well as higher level ADL's[,] including driving." (R. at 214.) Plaintiff reported pain in her low back and gluteal area as 7/10, and noted numbness in her right hand. (*Id.*) Dr. Oken noted the following clinic results:

i.    Plaintiff's demonstrated strength in her extremities: 4+/5 bilateral lower extremities and 5/5 in upper extremities;

ii.    Plaintiff demonstrated "diminished anterior and posterior bending of the spine[,] as well as bending";

iii.    Plaintiff demonstrated the following levels of strength on straight leg raises: 70 degrees on the left leg, 55 degrees on the right leg;

iv.    Plaintiff demonstrated the following levels of strength on her hands: 55 pounds on the right and left hand grasps; and

v.    Plaintiff experienced "mild sacroiliac joint tenderness on the right side."

(R. at 214.) Doctor Oken recommended physical therapy, 300 mg of Neurontin daily, and Magnetic Resonance Imaging ("MRI") of her cervical spine to rule out any herniation. (R. at 214.) In addition, Dr. Oken noted Plaintiff's current medications: Hyzaar, Lasiz, Atenolol, Vicodin, Flexeril, Effexor, Clonazepam, and over-the-counter Prilosec. (R. at 213.)  Plaintiff

underwent an MRI on her cervical spine on August 21, 2003.[1] (R. at 169.) This MRI revealed

minor degenerative changes involving certain discs, but the radiologist found "no evidence of

frank disc herniations or significant spinal stenosis." (R. at 169.)

Dr. Oken saw Plaintiff next on May 12, 2004. (R. at 212.) He reported no new symptoms

or improvement on this day, but refilled Plaintiff's prescriptions for Neurontin, Vicodin, and

Flexeril; he also noted Plaintiff was scheduled to start physical therapy that day. (R. at 212.)

Plaintiff returned to Dr. Oken for the third time on June 3, 2004. (R. at 211.) Again, Dr. Oken

reported minimal changes in Plaintiff's condition other than significantly decreased numbness in

her hands, which was "essentially gone," and her progress in physical therapy, which was slow.

(R. at 211.) Dr. Oken increased the Neurontin prescription and scheduled an Electromyography

("EMG") for the following week. (R. at 211.)

Plaintiff visited Dr. Oken for the fourth time on June 9, 2004, and reported decreased pain

(5-6/10). (R. at 209.) Dr. Oken reported no atrophy in her hands bilaterally and performed an

EMG on various muscles, although the EMG was limited due to Plaintiff's "inability to tolerate

---

[1] Plaintiff underwent four subsequent MRIs. The next MRI for back pain was taken on
August 21, 2003. (R. at 169.) This MRI revealed minor degenerative changes involving discs at
L3-L4 and L5-S1 with some mild central bulging of the disc at the L5-S1. (R. at 169.) The
radiologist also reported finding "no evidence of frank disc herniations or significant spinal
stenosis." (R. at 169.) On April 30, 2004, another MRI was taken in response to Plaintiff's
complaint of neck pain. (R. at 168.) This MRI revealed "very minimal central and left lateral
bulging of the disc at the C5-C6 and C6-C7 levels" but "[did] not appear to impinge upon the
spinal canal significantly or the neural foramen." (R. at 168.) Another MRI for low back pain
was taken on August 10, 2004, and the results were dictated the following day. (R. at 167.) The
radiologist reported "degenerative disc disease, L5-S1 with central right-sided bulge and
narrowing of the disc space," as well as "lumbarization of S1." (R. at 167.) The last MRI was
taken on June 9, 2005, and found "a transitional vertebra with lumbarization of S1" as well as
"signal change at L5-S1 indicating degenerative disc disease with central disc protrusion and
displacing the thecal sac." (R. at 238.) The report also found "[s]ignal changes in the apophysial
facet joints . . . seen at L4-L5 and L5-S1 indicating facet osteoarthropathy." (*Id.*).

needling." (R. at 209.) The results revealed no abnormalities in "insertional activity," "fibrillation," "motor unit recruitment . . . [and] morphology," and "maximal recruitment." (R. at 209.) Dr. Oken concluded that Plaintiff had "[s]ensory carpal tunnel syndrome, mild on the right." (R. at 209.)

A few weeks later, on June 29, 2004, Plaintiff paid Dr. Oken another visit, this time complaining of "stiffness in her hands, thumb and forearm." (R. at 208.) Dr. Oken also observed tenderness in right mid-back, right lower back, and other tender and trigger points. (R. at 208.) He noted the following impressions: "carpal tunnel syndrome, probably bilaterally"; "[r]adicular pain syndrome, upper extremities"; and "sacroiliac joint dysfunction." (R. at 208.)

Dr. Oken saw Plaintiff again on July 16, 2004. (R. at 207.) This time, Plaintiff complained of muscle cramps and "low middle back pain and pain radiating . . . into her legs." (R. at 207.) She reported to him that she could sleep only six hours per night and had begun psychiatric treatment: she had been seeing a psychiatrist once every three months and a therapist once a week for her depression. (R. at 207.) Dr. Oken administered "trigger point" injections into her back. (R. at 207.) It appears from the record that Plaintiff did not see Dr. Oken again until February 2, 2005. (R. at 171.) In the interim, she saw Doctor Deepthi Saxena ("Dr. Saxena"). (R. at 195-206.)


2.    <u>Doctor Saxena</u>

Plaintiff first saw Dr. Saxena on August 25, 2004. (R. at 205.) During this visit, Dr. Saxena administered leg bent and fibromyalgia tests. (R. at 205.) The former "was positive for hypomobility in her right SI joint." (R. at 205.) The latter "was positive for all 18 out of 18

tender points." (R. at 205.) Dr. Saxena's final diagnosis included "[b]ilateral SI joint dysfunction greater on the right than left"; "piriformis myofascial pain sydrome"; fibromyalgia; insomnia; and depression. (R. at 205.) Dr. Saxena prescribed physical therapy, Flexeril, and recommended that Plaintiff discuss with her psychiatrist increasing the dosage of Effexor. (R. at 206.) During the next several months, Dr. Saxena examined Plaintiff four more times. (R. at 201, 199, 197, 195.) On September 23, 2004, Dr. Saxena also noted that "she has not started her aerobic program . . . [, and] has not been going to her physical therapy program regularly." (R. at 201.)

During Plaintiff's penultimate visit on November 18, 2004, Dr. Saxena noted that Plaintiff's pain had improved with medication, and that "[p]ain is within her control[,] [even though] [s]he does complain that she has a few area[s] in the upper outer quadrant of her buttocks [that] are painful." (R. at 197.) Plaintiff's final visit came on December 15, 2004, where she complained of general pain and insomnia. (R. at 195.) Dr. Saxena injected Plaintiff with Lidocaine and Kenalog into her "upper out [sic] gluts, four on each side." (R. at 195.)

### 3. Physical Therapy, Mental Assessment, and BDDS Doctors

On January 9, 2005, Plaintiff first began physical therapy treatment, which ended sometime in February. (R. at 172-194.) In February, 2005, Plaintiff began mental health treatment, which appears to have continued through December 9, 2005. (R. 289-301.) During this period, on July 18, 2005, Doctor John F. Conran ("Dr. Conran"), a doctor selected by the Bureau of Disability Determination Services ("BDDS"), diagnosed Plaintiff with moderate depression and posttraumatic stress disorder. (R. 233-36.) Later, on August 17, 2005, Doctor Robert

Jackson, Ph.D. ("Dr. Jackson"), completed a psychiatric review technique form. (R. at 242.) On

this form, Dr. Jackson indicated that Plaintiff's medical impairments were not severe. (R. at 242.)

The following week, on August 26, 2005, Plaintiff visited BDDS-selected Doctor Peter

Biale ("Dr. Biale"), who examined her for forty minutes and made the following clinical

impressions:

Problem #1: Hypertension, under treatment for the past three years. The claimant denies CVA or myocardial infarction. Current readings are elevated. The claimant was advised to seek medical help.

Problem #2: Fibromyalgia. The claimant has had this problem for quite a while. It appears that the medication is not effective. She has generalized muscle pain. The examination revealed that she has multiple trigger points. She is depressed and doesn't sleep at night.

Problem #3: Right Carpal Tunnel Syndrome. Examination revealed that the Tinel test was positive in the right hand. The finger grasp and hand grip was 5/5.

Problem #4: Depression, under treatment.

Problem #5: Low Back Pain. The limitations of the lumbosacral spine were described in the Back Section. The claimant had a recent MRI and the results will be forwarded to the [DDDS].

Problem #6: Obesity. The claimant is 67 inches and weighs 270 pounds. There is limited motion of the lumbosacral spine.

(R. at 263-64.) During the examination, Dr. Biale noted that Plaintiff's joints were normal, she

could bear her own weight, and her gait was normal. (R. at 263.) He also noted that she was

obese, and she could not squat or do the heel walk and toe walk due to problems with her back.

(R. at 263-64.) Plaintiff's finger and hand grasps were unimpaired with each hand. (R. at 263.) As

for Plaintiff's back, Dr. Biale noted that "[t]here was full range of motion of the cervical spine[,] . . . [t]he lumbosacral spine range of motion was limited, flexion [thirty degrees], extension in the paraspinal muscles[,] [and] [t]he straight leg raise test was positive in both legs at [sixty degrees]." (R. at 263).

On September 11, 2005, several weeks after Plaintiff's visit to Dr. Biale, Doctor Raymond Castaldo ("Dr. Castaldo"), a State-agency doctor, reviewed Plaintiff's medical records and completed a "Physical Residual Functional Capacity Assessment." (R. at 265-72.) Dr. Castaldo did not examine Plaintiff. (R. at 265-72.) In his report, Dr. Castaldo found the following:

i.      Plaintiff could occasionally lift and/or carry 20 pounds;

ii.     Plaintiff could frequently lift and/or carry 10 pounds;

iii.    Plaintiff could stand and/or walk (with normal breaks) for a total of
        at least two hours in an eight-hour workday;

iv.     Plaintiff could sit (with normal breaks) for a total of about six hours
        in an eight-hour workday;

v.      Plaintiff could push and/or pull (including operation of hand and/or
        foot controls) for an unlimited period, other than as shown for lift
        and/or carry.

(R. at 266.) Additionally, Dr. Castaldo concluded that Plaintiff had the following postural limitations "occasionally": climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (R. at 267.) He also noted Plaintiff should avoid hazards, such as machinery. (R. at 269.) He based his assessments on Plaintiff's low back pain and fibromyalgia as well as the instability that may result from these conditions. (R. at 266-67, 269.) Dr. Castaldo concluded that Plaintiff retained the capacity for sedentary work. (R. at 272.)

Starting on August 24, 2005, just prior to Dr. Castaldo's assessment, Plaintiff again attended physical therapy sessions seven times in around three weeks;[2] she did not perform any additional physical therapy after her final session on September 15, 2005. (R. at 257-60.)

### 4.    Doctor Yee

Also during this time—from March 2005 through June 2005—Plaintiff consulted Doctor Martin Yee ("Dr. Yee"). Plaintiff's initial visit to Dr. Yee took place on March 16, 2005, at which time she complained of pain in her lower back, shoulders, and right buttock. (R. at 231.) Dr. Yee noted that Plaintiff reported no problems sleeping and an improvement of pain, which Plaintiff rated as six to seven on a ten-point scale. (R. at 231.) Dr. Yee also commented that Plaintiff was "moderately obese" and had her pain under control. (R. at 231-32.) He refilled some of her prescriptions and recommended she stop using tobacco. (R. at 231-32.)

Plaintiff visited Dr. Yee again on May 16, 2005 (R. at 228-30), complaining of renewed numbness in her feet, which Plaintiff suggested could be aggravated by her obesity (R. at 228). Dr. Yee concluded that Plaintiff had fibromyalgia and recommended that Plaintiff reduce her weight. (R. at 229.) He also renewed her prescription for Neurontin. (R. at 229.)

### 5.    Doctor Nasreen Ansari

One month later, on June 2, 2005, Plaintiff visited Doctor Nasreen Ansari ("Dr. Ansari"), whom she had been seeing since 2001. (R. at 217-224, 315-31.) During her visit on June 2, 2005, Dr. Ansari, in an "Arthritic Report," diagnosed Plaintiff with fibromyalgia, dating its onset nine

---

[2] In 2005, Plaintiff attended physical therapy on August 24 and 26, and on September 1, 2, 6, 8, and 15. (R. at 258.)

years prior. (R. at 217.) In this report, Dr. Ansari indicated that Plaintiff could sit and stretch for thirty minutes to one hour and could assume the alternative position for relief for five to ten minutes. (R. at 218.) Under the question that stated, "Is a job which permits shifting positions at will from sitting, standing, walking needed?" Dr. Ansari wrote "Yes." (R. at 218.)

### 6. Dr. Yee's Further Examinations and Opinions

On August 25, 2005, one day before Dr. Biale examined her, Plaintiff saw Dr. Yee; she saw him again on September 9, 2005. (R. at 282.) At this time, Plaintiff complained that physical therapy caused her pain, but Dr. Yee urged her to continue the physical therapy and recommended she wear wrist splints. (R. at 282.) He also prescribed Duragesic to supplement Plaintiff's medications. (R. at 282.)

Dr. Yee saw Plaintiff again on October 7, 2005, but noted no new developments, except that Plaintiff had stated that she had been sleeping between four to five hours a night, but gained additional rest during the day. (R. at 283.) Dr. Yee noted that point tenderness still existed "along the paraspinals in the mid to lower back along the subscapular region and superior/posterior pelvic regions." (R. at 283.) Plaintiff followed up with Dr. Yee on November 4, 2005. (R. at 284.) Although Dr. Yee noted Plaintiff had decreased right touch sensation on the lateral aspect of her right calf and thigh, he made no new diagnoses, and Plaintiff made no new complaints. (R. at 284.) Plaintiff also agreed to undergo an EMG and to complete physical therapy. (R. at 284.)

Dr. Yee's involvement finally ended on December 12, 2005, when he completed the "Fibromyalgia Residual Functional Capacity Questionnaire." (R. at 305-08.) On this report he

indicated that Plaintiff had the following symptoms: multiple tender points, chronic fatigue, and numbness and tingling. (R. at 305.) He also noted Plaintiff had pain in the following areas: lumbosacral spine, cervical spine, thoracic spine, shoulders (bilateral), arms (bilateral), hands/fingers (bilateral), legs (bilateral), and knees/ankles/feet (bilateral). (R. at 306.)

Dr. Yee opined that Plaintiff's pain and symptoms were severe enough to "constantly" interfere with the attention and concentration needed to perform even simple work tasks. (R. at 306.) He opined further that she is capable of low-stress jobs, and indicated she can sit for fifteen minutes at one time, stand for fifteen minutes at a time, and sit, stand, and walk for less than two hours during an eight-hour workday–even though Plaintiff did not require an assistive device to walk. (R. at 307.) He went on to note that, during an eight-hour workday, Plaintiff needed to get up and walk for ten minutes periodically, which might require unscheduled breaks of ten minutes up to four times per workday. (R. at 307.) This necessitated, he opined, a job that allowed shifting positions at will from sitting, standing, or walking. (R. at 307.)

Dr. Yee also opined that Plaintiff could never lift and carry any amount of weight in a competitive work situation, and could never twist, stoop (bend), crouch, climb ladders, or climb stairs. (R. at 308.) Additionally, it was Dr. Yee's opinion that Plaintiff could never look down (sustained flexion of neck), turn head right or left, or look up, and had significant limitations in doing repetitive reaching, handling, or fingering; but Plaintiff could "frequently" hold head in a static position. (R. at 308.) Dr. Yee limited hand, finger, and arm use to two hours per eight-hour workday. (R. at 308.) Concluding, Dr. Yee opined that Plaintiff would be absent from work an estimated four days per month. (R. at 308.)

7.    <u>Doctor B.J. Beresford</u>

The following year, on October 9, 2006, Doctor B.J. Beresford ("Dr. Beresford") completed a "Mental Impairment Questionnaire." (R. at 309-314.) Dr. Beresford had seen Plaintiff for less than one year, starting in February 2005. (R. at 309.) He identified a litany of symptoms that Plaintiff exhibited, including generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating. (R. at 310.) Dr. Beresford made the following findings as they related to Plaintiff's mental abilities and aptitudes to perform unskilled work:

i.      Plaintiff's ability to do the following were "seriously limited, but not precluded":

   a.   Understand and remember detailed instructions;

   b.   Carry out detailed instructions;

   c.   Maintain socially appropriate behavior; and

   d.   Adhere to basic standards of neatness and cleanliness.

ii.     Plaintiff was "unable to meet competitive standards" for the following activities:

   a.   Set realistic goals or make plans independently of others;

   b.   Deal with stress of semiskilled and skilled work;

   c.   Interact appropriately with the general public; and

   d.   Travel in unfamiliar places.

iii.    Plaintiff's ability to do the following were "limited but satisfactory":

   a.   Use public transportation.

(R. at 312.) To support these findings, Dr. Beresford cited poor concentration, fatigue, and anxiety/agoraphobia. (R. at 312.) He opined that Plaintiff had moderate functional limitations on her daily living activities; marked functional limitations in her ability to maintain social

- 12 -

functioning; and extreme functional limitations in her ability to concentrate. (R. at 313.) Like

Dr. Yee, Dr. Beresford concluded that Plaintiff would likely miss four days of work per month.

He further opined that Plaintiff's condition would last at least twelve months, she was not a

malingerer, and she suffered from depression and post-traumatic stress disorder. (R. at 314.)

### C.  The Hearing for Benefits

One day after Dr. Beresford issued his report, the SSA held a hearing on the issue of

Plaintiff's benefits. (R. at 381, 383.) The ALJ presided over the hearing. (R. at 381, 383.)

### 1.  Plaintiff's Testimony

The hearing began with Plaintiff's testimony. (R. at 386-87.) Plaintiff testified about the

types of jobs she had held; this testimony was consistent with information already described in

this Opinion. (R. at 387.) Plaintiff testified that she had "severe tendonitis in 1999" and, after

2003, "had a series of three shots in [her] back, . . . [which] was bothering [her] a lot." (R. at

387.) The transcript indicates that Plaintiff had tendonitis in her wrists, for which Dr. Yee gave

her braces to wear. (R. at 388-89.) Plaintiff testified that she could not return to her old job

because she was "in too much pain to sit for that long." (R. at 391.) Additionally, Plaintiff stated

that walking was difficult because her back made it "hard . . . [to] [stand] for any long period of

time." (R. at 391.) She pointed to problems in her hips, and stated that she could not walk for

more than one block. (R. at 392.). Plaintiff testified she could stand for about ten or fifteen

minutes. (R. at 395.)

In response to the ALJ's query, Plaintiff said that physical therapy helped her symptoms

"[a] little bit," but noted that she had not been attending sessions as often as she should because

of financial constraints. (R. at 391.) The ALJ also questioned Plaintiff about her weight, which she said had decreased by about forty pounds (from 280 to 240 pounds) in the last month or so. (R. at 400.) She stated that the weight loss had helped "self-esteemwise, but [not] physically." (R. 401.) She noted that her foot pain actually became worse after she lost weight. (R. at 401.) She did comment that her medications had made her pain "more tolerable." (R. at 396.) She also stated that she went shopping for groceries and medicine and could lift a gallon of milk on "[a] good day." (R. at 397.)

As far as her dexterity goes, Plaintiff could "sign her name and stuff a little bit [*sic*]." (R. at 394.) Plaintiff testified that she sometimes awoke with "pain from the shoulder all the way down to [her] fingertips," and could "still feel [the pain]" when she "pick[ed] up a big glass of . . . water or juice." (R. at 398.) In the end, though, the pain would "go away and work[] itself out a little bit." (*Id.*) Typing, she stated, was difficult because of "[t]he pain in [her] fingers." (R. at 400.) She testified that she did not use a computer much because "sitting in the weird chair" made it difficult. (*Id.*) Because of the pain in her hips, Plaintiff testified she could sit for a maximum period of forty-five minutes to one hour; otherwise she had to be reclined or lying down. (R. at 408-09.) Additionally, she made a few generalized statements about her pain. When testifying about her social life, she said that she wanted to be social, but "[she was] in so much pain[] [ that she could not] go anywhere or do anything[,] . . . and people [did not] understand that at all." (R. at 399.)

In addition to her physical ailments, Plaintiff testified about her mental problems—namely, depression. (R. at 401-02.) She testified that her depression worsened because of her fibromyalgia, carpal tunnel, and tendonitis, and that her medications sometimes

had adverse side effects, such as drowsiness. (R. at 402-03.) Other mental problems she testified

to included migraine headaches (once per week, depending on the weather), anxiety, and

difficulty concentrating. (R. at 404-406.) As a result of her conditions, she slept about four to five

hours per night, but made up the rest during the day, sleeping between one-half hour and three

hours during that time. (R. at 405-406.)

### 2.    Medical Examiner's Testimony

Doctor Sheldon Slotke, the Medical Examiner ("ME"), testified next and spoke mostly

about the trigger points that Dr. Yee had identified in his diagnosis of Plaintiff. (R. 411, 413-15.)

The ME compared the American College of Rheumatology's ("ACR") classification of

fibromyalgia to the Residual Functional Capacity ("RFC"), noting that the list of trigger points on

the RFC did not correlate exactly with ACR's list. (R. 414-15.) He stated that he "found several

instances where they mentioned five or six trigger points, but again, they weren't mapped or

listed." (R. at 415.) The ME emphasized that the trigger points required "pain," not "tenderness,"

and that the trigger points for fibromyalgia were different from the specific map locations

identified for arthritis. (R. at 418-19.) He noted that Dr. Yee's assessment focused on the arthritic

trigger points, not those for fibromyalgia. (R. at 418.)

Additionally the ME stated that, in the record, "there is no listing for obesity[,] [t]here's

no listing for migraine[,] and there is no listing for fibromyalgia," though "[Plaintiff] had some

injections done at trigger points." (R. at 423.) He went on to note that "the people who are

sufficiently qualified people[,] such as the physicians at Marion Joy, should be able to make a

diagnosis of fibromyalgia." (R. at 423.) He emphasized that "[f]ibromyalgia is not a disease of

the joints," and the pain locations on Plaintiff are actually joints locations, not fibromyalgia trigger points. (R. at 419-20.)

The ME also noted that Plaintiff could lift seven pounds of weight from the floor to waist, carry eight pounds of weight 600 feet, and push forty-five pounds 600 feet. (R. at 416-17.) He testified that "[t]here is no question that she has low back pain 1.04[] [and] hypertension 4.03." (R. at 417.) This, he said, could be explained by the disc displacement displayed in the MRI dated June 9, 2005. (R. at 421.)

The ALJ asked the ME to opine an RFC assessment, to which the ME replied that he "would put [Plaintiff] somewhere between sedentary and light," basing his opinion on only the objective evidence in the record. (R. at 424, 435.) The remaining testimony is difficult to understand, and neither party does a sufficient job explaining the exchanges between Plaintiff's attorney, the ME, and the ALJ. When pressed to define fibromyalgia, the ME read in the definition from the ACR:

> Pain is considered widespread when all of the following are present[:] pain in the left side of the body, pain in the right side of the body, pain above the waist, pain below the waist. In addition, axial skeletal pain must be present. Shoulder and buttock pain is considered pain for each of the involved citing. Low back pain is considered low back pain – lower segment pain.

(R. at 432.) Additionally, the ME stated, eleven of the eighteen mapping points must be present. (R. at 432.) The ME then testified that Plaintiff's pain was consistent with the doctors' diagnosis in the record, though he would not concede that she suffered from fibromyalgia because he "[had] not examined this patient." (R. at 433.) Finally, he pointed out that "after the alleged onset

date, there was an evaluation and a physical therapy session of a certain level of functioning, which was lower than . . . [Dr. Yee's] RFC." (R. at 434.)


### 3. Vocational Expert's Testimony

Lee Newsome, the vocational expert ("VE"), gave the remaining testimony. (R. at 438-45.) The ALJ first asked the VE, and the VE agreed, "to testify in accordance with the information contained in the DICTIONARY OF OCCUPATIONAL TITLES [("DOT")], . . . [and to inform the ALJ] if there [was] a difference between [his] testimony and the information of those sources." (R. 439.) The VE first testified to Plaintiff's past work experience, characterizing her jobs in the following ways: customer service (semi-skilled and sedentary); receptionist (semi-skilled and sedentary); general office clerk (performed at sedentary level); reservation clerk (semi-skilled and sedentary); bookkeeper (skilled and sedentary); and accounting clerk (skilled and sedentary). (R. at 439.)

The ALJ then asked a series of hypothetical questions about the ability of a hypothetical individual to perform various types of work. (R. at 439-43.) In response to the ALJ's first question, the VE affirmed that a "hypothetical individual limited basically to sedentary exertional abilities, no more than superficial contact with supervisors, co-employees and the general public," would be able to "[perform] the duties of the general office clerk, the bookkeeper, and the accounting clerk," but not the other jobs. (R. at 439.) When the ALJ imposed a further limitation of "simple, unskilled work," the VE testified that such an individual could be a bench assembler, inspector, weigher, or handpacker; those jobs combined totaled 11,900. (R. at 440.)

When the ALJ imposed another limitation—the requirement that the individual lie down for one hour per workday—the VE testified that "she wouldn't be employable in any job locally or nationally." (R. at 440.) Then the ALJ lifted the lying-down limitation, but added an inability to stay on task for an average of fifteen minutes per workday. (R. at 440.) The VE replied that she would be unemployable anywhere. (R. at 440.) The ALJ then lifted the concentration limitation and added the limitation that the employee would miss at least two days a month. (R. at 441.) The VE replied she would be marginally employable, but would be wholly unemployable if the individual had to miss three or more days a month. (R. at 441.)

Finally, the ALJ returned to the original hypothetical he proposed, and asked about an individual with frequent, but not constant, fine finger manipulations. (R. at 441.) The VE stated that bench assembler would be eliminated but bookkeeper, general office clerk, and accounting clerk might be jobs that this person could perform. (R. at 442.) But with occasional fine finger manipulations, the VE eliminated all jobs. (R. at 442.) The VE further testified that occasional use of the dominant hand would eliminate all jobs, even if the non-dominant hand could be used frequently. (R. at 433.) The Plaintiff's attorney then asked for "the DOTs and the [Specific Vocational Preparations] for [general office clerk, bookkeeper, and accounting clerk]," but the VE testified that he did not have those available, though it appears he might actually have handed them to Plaintiff's attorney.[3] (R. at 443.)

---

[3] When asked this question by Plaintiff's attorney, the VE responded first, "I don't think so," but then said, "These are some I filled out." (R. at 443.) Plaintiff suggests that the VE "could not provide . . . the numbers of the jobs [the VE] described earlier." (Pl.'s Mem. in Supp. of Mot. Summ. J. at 10.) The argument is addressed below.

### III.  ALJ's Findings

The ALJ made the following findings in an opinion dated March 29, 2007:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since February 3, 2004, the amended onset date of disability (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.920(c)).

3. The claimant has the following severe impairments: fibromyalia [*sic*]; a disorder of the back; and an affective disorder and an anxiety related disorder (20 CFR 404.1520(c) and 416.920(c)).

* * *

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform unskilled sedentary exertonal [*sic*] level work involving lifting and carrying objects weighing up to ten pounds. Based on the claimant's mental impairments of an affective disorder and anxiety-related symptoms, she is limited to no more than superficial contact with supervisors, co-employees, and the general public. Postural limitations include the avoidance of work at unprotected heights, and around dangerous moving machinery and open flames and bodies of water.

* * *

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7. The claimant was born on December 11, 1969 and was 32[]years old on the alleged disability onset date, which is defined as a younger individual age 18-44, (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because Using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

\* \* \*

11. The claimant has not been under a disability, as defined in the Social Security Act from February 3, 2004[,] through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 20-25.)

## IV.  Discussion

A claim of disability is determined under a sequential five-step analysis. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. The first step considers whether the claimant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation

proceeds to step four. The fourth step assesses the applicant's RFC and ability to engage in past

relevant work. If an applicant can engage in past relevant work, she is not disabled. If the

applicant cannot engage in past relevant work, the fifth step assesses whether she can engage in

other work in light of her RFC, age, education, and work experience.

In this case, at Steps One and Two, the ALJ determined that Plaintiff had not engaged in

substantial gainful activity, and that she has severe impairments due to fibromyalgia, a disorder

of the back, an affective disorder, and an anxiety related disorder. (R. at 20.) At Step Three, the

ALJ determined that the impairments did not meet or medically equal the listed impairments.

Thus, the ALJ proceeded to assess Plaintiff's RFC and ability to engage in past relevant work as

part of Step Four. The ALJ determined that the Plaintiff's RFC was "to perform unskilled

sedentary exertonal [*sic*] level work involving lifting and carrying objects weighing up to ten

pounds." (R. at 21.) The ALJ then concluded that Plaintiff was "unable to perform any past

relevant work." (R. at 24.) Finally, at Step Five, the ALJ found that "there are jobs that exist in

significant numbers in the national economy that [Plaintiff] can perform. Thus, the ALJ

concluded that Plaintiff was not disabled. (R. at 25.)

Plaintiff argues that this Court should reverse and remand the ALJ's conclusion that

Plaintiff is not disabled because the ALJ erred in (1) Step Four RFC assessment and (2) Step

Five of the disability inquiry. In reviewing the ALJ's decision, the courts "may [not] . . . reweigh

evidence, resolve conflicts in the record, [or] decide questions of credibility." *Young v. Barnhart*,

362 F.3d 995, 1001 (7th Cir. 2004). The court's "task is limited to determining whether the ALJ's

factual findings are supported by substantial evidence." *Id.* Evidence is substantial "if a

reasonable person would accept it as adequate to support the conclusion." *Id.* Additionally, the

court must review the ALJ's decision to ensure the ALJ has built an "accurate and logical bridge from the evidence to his conclusion so that[] a reviewing court . . . may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Id.* at 1002. Where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be [reversed and] remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The Court addresses Plaintiff's arguments in turn.

### A.      Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC under Step Four because his findings with respect to Plaintiff's mental and physical limitations were not supported by substantial evidence, and because the ALJ failed to build an "accurate and logical bridge" between her physical and mental limitations and the RFC assessment. (Pl.'s Mem. in Supp. of Mot. Summ. J. 11.) The RFC is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1), SSR 96-8p). For the RFC finding to be supported by substantial evidence, the ALJ "must consider all medically determinable impairments, *physical and mental*, even those that are not considered "severe." *Id.* (citing § 404.1545(a)(2), (b), (c)) (emphasis added). More specifically, the ALJ must "evaluate[] the evidence submitted by the . . . medical experts . . . and[,] where that evidence [is] conflicting, . . . resolve[] those conflicts by giving more weight to some evidence and less to others." *Young*, 362 F.3d at 1001; *see also Clifford v. Apfel,* 227 F.3d 863, 873-4 (7th Cir. 2000) (citing *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)).

- 22 -

In addition to supporting the factual findings with substantial evidence, the ALJ must build an "accurate and logical bridge" between substantial evidence and the RFC assessment. *Zblewski v. Astrue*, No. 08-1755, 2008 WL 5206384, at \*2 (7th Cir. Dec. 15, 2008). Although courts may uphold the ALJ's "cursory" and "somewhat incomplete" bridge-building, *Zblewski*, 2008 WL 5206384, at \*2, the ALJ may not "ignore an entire line of evidence." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). The ALJ must cite specific evidence to support his conclusions and discuss how he reached those conclusions. SSR 96-8 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."). The ALJ also "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

1.    Mental Residual Functional Capacity

With respect to Plaintiff's mental limitations, the ALJ made the following findings: (1) mild limitations in regard to restrictions of daily living activities; (2) moderate limitations in regard to maintaining social functioning; and (3) mild limitations in maintaining concentration, persistence, and pace. (R. at 23.) Plaintiff's argument addresses only one of the ALJ's findings: mild limitations in maintaining concentration, persistence, and pace. Plaintiff argues that such finding is not supported by substantial evidence, and that the ALJ failed to build an "accurate and logical bridge" from this evidence to the RFC limitation of unskilled work. (Pl.'s Mem. in Supp. of Mot. Summ. J. 17-18.)

First, the Court considers whether the ALJ's finding was supported by substantial evidence. The ALJ "[gave] considerable . . . weight to the opinion of the medical expert" and made a conclusory statement that Plaintiff's "mental health assessment [was] inconsistent with the treatment records." (R. at 23.) But, as Plaintiff points out, the medical expert admitted that he "[did not] do psychiatry and [he could not] evaluate the psychiatry." (R. at 420; Pl.'s Mem. in Supp. of Mot. Summ. J. 17.) Commissioner argues that the ALJ's mental functioning capacity limitation is supported by the opinion of Dr. Jackson, a state agency psychologist. But there is no evidence in the record that the ALJ actually considered or gave weight to Dr. Jackson's opinion. (Def.'s Resp. & Mem. Supp. Cross-Mot. Summ. J. 10-11.) Further, the ALJ ignored the opinions of Dr. Conran and Dr. Beresford, whose testimony conflicted with Dr. Jackson's opinion. (Pl.'s Reply 6.) Dr. Conran, a doctor selected by the BDDS, diagnosed Plaintiff with *moderate* depression and posttraumatic stress disorder; Dr. Beresford, who completed a "Mental Impairment Questionnaire," found that Plaintiff had *extreme* functional limitations in her ability to concentrate. (R. at 233-36, 313.) Because the ALJ failed to consider relevant medical evidence and resolve conflicts in such evidence, this Court concludes that the ALJ's finding of Plaintiff's "mild limitation in concentration, persistence, and pace" was not supported by substantial evidence.

Contrary to Plaintiff's argument, however, the ALJ did not have to consider evidence of Plaintiff's global assessment of functioning ("GAF") score of 40 and the bolstering effect that Plaintiff's medications and pain had on her mental limitations. (Pl.'s Mem. in Supp. of Mot. Summ. J. 17-18.) The GAF scale is intended to be used to make treatment decisions; neither the Social Security regulations nor case law require an ALJ to determine the extent of an individual's

disability based on the GAF score. *See Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002) (ALJ may use GAF score in formulating claimant's RFC but need not do so). Similarly, Plaintiff failed to direct the Court, and the Court did not uncover, any medical opinions indicating that Plaintiff's medications or pain had any effect on her mental impairments.[4]

Next, the Court considers whether the ALJ built an "'accurate and logical bridge' between [his] recitation of the mental medical evidence and the decision to account for [Plaintiff's] mental impairments by limiting [her] to unskilled work." *Craft,* 539 F.3d at 678. The RFC for unskilled work "by itself does not provide any information about [Plaintiff's] mental condition or abilities." *Id.* Thus, "[a]lthough the ALJ is not required to mention every piece of evidence," the ALJ's "failure to mention [relevant medical opinions] is cause for concern" because "[the court] cannot tell whether the ALJ considered and rejected [that] evidence." *Id.* In *Craft,* the Seventh Circuit reversed and remanded the ALJ's mental RFC assessment because the ALJ failed to mention or determine the weight of medical opinion concerning the plaintiff's mental functioning. *Id.* Like the ALJ in *Craft,* the ALJ here failed to mention medical opinions of Dr. Conran, Dr. Beresford, and Dr. Jackson, all of which discussed Plaintiff's mental limitations. (R. at 233-36, 242, 313.) Therefore, the Court concludes that the ALJ failed to build an "accurate and logical bridge" from the mental evidence to his mental RFC assessment of Plaintiff.

---

[4] Dr. Saxena merely recommended that Plaintiff discuss with her psychiatrist increasing the dosage of Effexor. (R. at 206.)

2. <u>Physical Residual Functioning Capacity</u>

Plaintiff argues that the ALJ erred in assessing her physical RFC by failing to articulate his reasoning. In other words, Plaintiff contends that the ALJ failed to build an "accurate and logical bridge" from the evidence to his conclusion because (1) he improperly weighed the opinions of treating physicians; (2) he disregarded relevant opinions of treating physicians; and (3) he ignored evidence of Plaintiff's obesity. The Court addresses each argument in turn.

i. *Weighing Treating Physicians' Opinions*

The ALJ "g[a]ve considerabl[y] more weight to the opinion of the [ME]" than Dr. Yee, whose testimony the ALJ found to be "grossly exaggerated." (R. at 23.) Plaintiff argues that, by doing so, the ALJ improperly weighed the testimony.

The ALJ "may discount a treating physician's medical opinion if it 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'" *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir.1985)) (finding the ALJ did not err in determining RFC where ALJ cited statements from the treating physicians that showed their examination of the patient was benign, the record indicated that claimant could manage her pain using medications, the claimant's lawyer had "apparently" drafted the "Functional Capacity Questionnaire" on which an examining physician listed that the claimant could not perform any work, and the treating

physician cited no new evidence to support this more extreme conclusion).[5] Therefore, the treating physician's opinion is not the "final word on the claimant's disability." *Schmidt*, 496 F.3d at 842. Even so, an ALJ cannot reject a treating physician's opinion merely because a non-examining physician gave a contradictory opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

In this case, Dr. Yee examined Plaintiff six times, (R. at 228-31, 282-84, 305-08), he is a treating physician, and his opinion is entitled to controlling weight. *Schmidt*, 496 F.3d at 842. Moreover, Dr. Yee's medical diagnosis dovetails with the opinion of the ME, who concluded that Plaintiff's symptoms were consistent with other physicians' diagnosis of fibromyalgia. (R. at 433.) In light of the fact that the ME is not Plaintiff's physician, agreed with fibromyalgia diagnosis in the record, but assessed Plaintiff at a different RFC, it seems the ALJ should have given his opinion *less* weight, not more, than Dr. Yee's. But what seems correct to this Court is not what matters; the ALJ decides how to weigh the evidence. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008) (stating that reviewing court must "view the record as a whole but do[es] not reweigh the evidence or substitute [its] judgment for that of the ALJ").

Nevertheless, the ALJ in this case failed to comply with the law by failing to explain why he gave more weight to the ME's testimony, or how the ME's opinion supported the ALJ's RFC

---

[5] A "treating physician" is "the claimant's physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502; *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (explaining that the "treating physician" language comes from 20 C.F.R. § 404.1502). It seems uncontroversial that Dr. Yee is a treating physician given that Plaintiff visited him six times. This Court observes that Dr. Oken and Saxena also are treating physicians.

determination.[6] Since he failed to "minimally articulate" his reasons for accepting or rejecting Dr. Yee's opinion—aside from the fact that the ME stated a different RFC—he erred in not affording controlling weight to Dr. Yee's opinion. *Schmidt*, 496 F.3d at 842.

Additionally, the ALJ found Dr. Yee's opinion to be incredible, but he never explained how or why he concluded that it was "grossly exaggerated." Furthermore, Plaintiff's other treating physicians' assessments, including those of Dr. Saxena and Dr. Oken, confirmed Dr. Yee's diagnosis. Based on the hearing transcript, the ALJ seemed concerned that Dr. Yee may have incorrectly diagnosed Plaintiff's fibromyalgia by focusing on incorrect trigger points. (R. at 418-20.) But even if that is true, the ME admitted that Plaintiff's symptoms were consistent with fibromyalgia, and that she had pain in her lower back. Thus, the fact that the ME expressed concern as to the trigger points used to diagnose Plaintiff has no bearing on the case; the ME *agreed* that Dr. Yee's diagnosis was consistent with the medical record. (R. at 433.)

For these reasons, this Court finds the ALJ failed to minimally articulate his reasoning for rejecting the treating physician's opinion and, therefore, did not build an "accurate and logical bridge" between the cited evidence and his physical RFC assessment.


ii.      *Considering Evidence in its Entirety*

Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC because he failed to analyze contradictory evidence. An ALJ is not required to address every piece of testimony and

---

[6] The ME's conclusory statement that Plaintiff's RFC was somewhere between light and sedentary is not a sufficient articulation of the ALJ's reason for determining a specific RFC. (R. at 21.)

evidence. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). But an "ALJ may not select and discuss only that evidence which favors his ultimate conclusion." *Id.* at 307. Rather, the ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Id.*

Here, the ALJ concluded that "[p]hysical examination of the claimant was essentially normal." (R. at 22.) He explained this conclusion by focusing on Dr. Biale's observation that "[t]here was full range of motion in the spine" and ignoring evidence of pain and difficulty sitting and standing that Plaintiff experienced and that Drs. Yee, Saxena, and Oken discussed in their opinions. (R. at 20-5.) Rather, the ALJ merely noted Dr. Biale's other clinical impressions, which noted that Plaintiff had hypertension, fibromyalgia, carpal tunnel syndrome, depression, low back pain, and obesity.

This Court finds that a full range of motion does not always rule out limitations imposed by Plaintiff's back pain and difficulty sitting or standing. THE MERCK MANUAL 321 (Mark H. Beers et al. eds., 18th ed. 2006); ROSCE N. GRAY & LOUISE J. GORDY, ATTORNEYS' TEXTBOOK OF MEDICINE ¶¶ 25.30-25.32 (3d ed. 1998). In fact, pain from fibromyalgia that occurs while sitting or standing is consistent with having a full range of motion. *Id.* Because the ALJ did not resolve the inconsistency between evidence he cited and contrary evidence in the record, the Court concludes that the ALJ's physical RFC determination is not supported by substantial evidence.

### iii.    *Evidence of Obesity*

Plaintiff argues that the ALJ erred in failing to consider the effect of her obesity on her

RFC. (Pl.'s Reply 4-5; Pl.'s Mem. in Supp. of Mot. Summ. J. 18-9.) An ALJ must consider any

limiting effects of obesity on a claimant's overall condition. *See Prochaska v. Barnhart*, 454 F.3d

731, 736-37 (7th Cir. 2006); *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). Although "[t]he

combined effects of obesity with other impairments may be greater than might be expected

without obesity . . . [the ALJ does not have to] make assumptions about the severity or functional

effects of obesity combined with other impairments." SSR 02-1p, 67 Fed. Reg. at 57862-3.

Therefore, the ALJ's failure to *explicitly* consider the plaintiff's obesity is harmless error

if (1) the ALJ reaches a final decision after reviewing the medical opinions of physicians

familiar with the claimant's obesity; and (2) the claimant fails to articulate how her obesity

limits her functioning and exacerbates her impairments. *Prochaska*, 454 F.3d at 736-37 (holding

that "any error on the ALJ's part was harmless . . . [b]ecause [plaintiff] failed to 'specify how

[her] obesity further impaired [her] ability to work,'" and because the ALJ "specifically

predicated his decision upon the opinions of physicians who did discuss her weight"); *Skarbek v.

Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that, "although the ALJ did not explicitly

consider [plaintiff's] obesity, it was factored indirectly into the ALJ's decision as part of the

doctor's opinions" and "[plaintiff] [did] not specify how his obesity further impaired his ability

to work.").

Similar to the ALJs in *Prochaska* and *Skarbek*, the ALJ here accounted for Plaintiff's

obesity indirectly by "specifically predicat[ing] his decision upon [an] opinion of [a] physician

who discuss[ed] [Plaintiff's] weight": the ALJ stated that he "gave considerable . . . weight to

the opinion of the medical expert, Dr. Sheldon Slodki." (R. at 23.) Dr. Slodki discussed

Plaintiff's obesity several times during the hearing, testifying that "there [was] no question that

[Plaintiff] ha[d] . . . obesity," and that "[Plaintiff] had morbid obesity, even though she [had]

lost weight." (R. at 417, 423.)

Additionally, like the plaintiff in *Prochaska*, Plaintiff failed to explain "how her obesity

limit[ed] her functioning and exacerbate[d] her impairments." (*See* Pl.'s Reply 4-5; Pl.'s Mem. in

Supp. of Mot. Summ. J. 18-19.) Further, not only did she fail to suggest expressly that obesity

exacerbated her impairment, but she also testified that "[her doctors] thought . . . [her weight

loss] would help the feet and[,] [yet, after she lost her weight,] [her] feet got *worse*." (*Id.*; R. at

401.) (emphasis added). For the above reasons, the Court concludes that the ALJ's failure to

expressly consider Plaintiff's obesity was harmless error.


**B.      Credibility Determination**

Plaintiff contends that this Court should reject the ALJ's "vague" credibility determination

as to Plaintiff's testimony because the ALJ did not "explain adequately the adverse credibility

finding." (Pl.'s Mem. in Supp. of Mot. Summ. J. 20.) Social Security Ruling ("SSR") 96-7p

"requires ALJs to articulate the reasons behind credibility evaluations[.]" *Brindisi ex rel Brindisi*

*v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003). In *Brindisi*, the Seventh Circuit considered

whether the ALJ sufficiently articulated his reasons or evaluated the evidence in the following

credibility determination:

> In considering the claimant's functioning and the areas of
> development, the undersigned has considered the testimony of the
> claimant and his mother, and find it generally credible. However to

the extent that the claimant's parents alleged total disability, the undersigned do not find them fully credible, as it is not supported by the objective medical evidence and other evidence of record (SSR 96-7p and 20 CFR 416.929).

*Id.* at 787. The court found that the above "determination [was] lacking any explication that would allow th[e] court to understand the weight given to [claimant's or his mother's] statements or the reasons for that consideration as required by SSR 96-7p." *Id.* Thus, the court concluded that the ALJ failed to comply with SSR 97-6p because he failed to "explain[] the weight given to the [claimant's and his mother's] statements and [did] not support its determination with any evidence in the record." *Id.*

The remark that the ALJ in this case made with respect to Plaintiff's credibility is similar to that in *Brindisi*:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. at 23.) This conclusory statement, even if preceded by cut-and-paste paragraphs from a doctor's medical report, does not explain how or why the ALJ determined the Plaintiff's testimony was "not entirely credible." Like the ALJ's statement in *Brindisi*, the ALJ's conclusory statement here does not suffice in light of SSR 97-6p. This Court cannot, from the ALJ's cryptic determination, "understand the weight given to [Plaintiff's] statements or the reasons for that consideration as required by SSR 96-7p." *Brindisi*, 315 F.3d at 788. It appears that the ALJ "disregard[ed] subjective complaints of disabling pain" not only "because a determinable basis for pain of that intensity does not stand out in the medical record," but also because he ignored

much of the medical evidence altogether. *Moss v. Astrue*, No. 08-1533, slip op. at 11 (7th Cir. Feb. 5, 2009) (per curiam).

Even absent this conclusion, however, the ALJ's adverse credibility determination cannot stand. To the extent that the contrary evidence supporting Plaintiff's statements existed, the ALJ must at least minimally articulate his reasons for rejecting that evidence–some of which, like the MRI finding degenerative discs in Plaintiff's back, was objective. As noted in the previous section, the ALJ erroneously failed to confront the contrary evidence in the record. Since the ALJ reached an RFC determination on the same basis that he discounted Plaintiff's credibility, this Court rejects his credibility determination for many of the same reasons as his RFC determination. Therefore, this Court finds the ALJ erred in determination of Plaintiff's credibility.

### C.    Step Five Determination

Plaintiff argues that the ALJ failed in his Step Five analysis because of three harmful errors. First, the ALJ "failed to incorporate all of Plaintiff's limitations" into his hypothetical questions. Second, "the ALJ failed to follow SSR 00-4p." Third, "the VE [failed to] describe the genesis of the numbers" the ALJ used. (Pl.'s Mem. in Supp. of Mot. Summ. J. 22-4). This Court addresses each argument separately.

#### 1.    Improper Hypothetical

Plaintiff first claims that the ALJ erred in the Step Five determination when he "failed to incorporate all of Plaintiff's limitations, including a need to have a sit/stand option, hand limitations, and other significant limitations into the RFC." (Pl.'s Mem. in Supp. of Mot.

Summ. J. at 22.) Plaintiff correctly notes that, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The "relevant limitations," however, are determined by the ALJ; thus, the ALJ must incorporate only those limitations that he found the claimant to exhibit. *Delaney v. Barnhart*, 2005 WL 1655204, at *11-12 (N.D. Ill. May 13, 2005). And, as the Commissioner correctly notes, the ALJ's hypothetical questions are proper when they "[reflect] [the plaintiff's] impairments to the extent that the ALJ found them supported by the evidence in the record." *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). Even so, the hypothetical question must be supported by the medical evidence in the record.

The ALJ determined that Plaintiff could "perform unskilled sedentary exertional level work involving lifting and carrying objects up to ten pounds." (R. at 21.) Additionally, the ALJ found that, based on Plaintiff's mental impairments, "she is limited to no more than superficial contact with supervisors, co-employees, and the general public." (*Id.*) Although this Court found that the ALJ failed to provide a sufficient explanation for his physical and mental RFC determinations, that fact does not necessarily render his hypothetical improper.

The ALJ asked the VE the following question:

> Suppose we have a hypothetical individual limited basically to sedentary exertional abilities, no more than superficial contact with supervisor, co-employees and the general public, and no work at unprotected heights, around dangerous moving machinery, open flames or bodies of water[.] [W]ould that hypothetical individual be able to return to any of her past relevant work?

(R. at 439.) The VE responded that he thought the hypothetical person could work as a "general officer clerk, [a] bookkeeper and [as an] accounting clerk." (R. at 439.) The ALJ then added an

additional limitation, asking whether all past work would be "knocked out if" the individual

could perform only "simple, unskilled work." (R. at 440.) The VE stated that other jobs remained

available even with this additional limitation. (R. at 440.)

The limitations the ALJ incorporated into his questions to the VE matched the limitations

set forth in his RFC determination. The questions are proper if, on remand, the ALJ determines

that the Plaintiff's RFC remains the same and sufficiently articulates his reasons for that finding.

But if the ALJ changes his RFC determinations, his questions may become improper. *Ehrhart*,

969 F.2d at 540. Therefore, this Court cannot, at this time, rule on the propriety of the ALJ's

hypothetical questions.

### 2. SSR 00-4p

Next, Plaintiff argues that the ALJ failed to inquire whether an inconsistency existed

between the DOT and the VE's testimony. (Pl.'s Mem. in Supp. of Mot. Summ. J. 23.) SSR

00-4p, which interprets the CFR, requires the ALJ who elicits testimony from a vocational expert

about the requirement of a job to determine whether the testimony is consistent with the DOT.

*Prochaska*, 454 F.3d at 735; *see* U.S. Dep't. of Labor, DICTIONARY OF OCCUPATIONAL TITLES

(4th ed. 1991), http://www.oalj.dol.gov/libdot.htm. SSR 00-4p reads, in relevant part:

> Occupational evidence provided by a VE or VS generally should be
> consistent with the occupational information supplied by the DOT.
> When there is an *apparent* unresolved conflict between VE or VS
> evidence and the DOT, *the adjudicator must elicit a reasonable
> explanation* for the conflict before relying on the VE or VS evidence
> to support a determination or decision about whether the claimant is
> disabled. At the hearings level, as part of the adjudicator's duty to
> fully develop the record, the adjudicator will inquire, on the record,
> as to whether or not there is such consistency.

SSR 00-4p (emphasis added). Thus, to comply with SSR 00-4p, an ALJ must follow a two-step process. *See Prochaska*, 454 F.3d at 735; *Overman*, 546 F.3d at 463. First, if the VE testifies to the requirements of a particular job, "the adjudicator *has an affirmative responsibility* to ask about any possible conflict between" the testimony and the DOT. *Prochaska*, 454 F.3d at 735 (emphasis in original). This responsibility is discharged where, at the conclusion of the VE's testimony, the ALJ "[asks] the VE if his testimony [is] consistent with the DOT." *Overman*, 546 F.3d at 463 (finding that this duty was discharged by asking this question at the end of the VE's testimony); *see Harris v. Astrue*, No. 06-222, 2007 U.S. Dist. LEXIS 96920, at *72-3 (N.D. Ind. Aug. 27, 2007) (explicitly requiring question to follow VE's testimony). The ALJ's inquiry must succeed the VE's testimony because the relevant SSR language provides that the ALJ has an affirmative responsibility to "[a]sk the VE or VS if the evidence he or she *has provided* conflicts with information provided in the DOT." SSR 00-4p (emphasis added); *see Harris*, 2007 U.S. Dist. LEXIS 96920 at *72-3. An ALJ cannot ask about conflicts based on the evidence the VE *has provided* if the VE *has not provided any information.*

In this case, the ALJ asked the VE "to testify in accordance with the information contained in the DICTIONARY OF OCCUPATIONAL TITLES ["DOT"], . . . [and to inform the ALJ] if there is a difference between [the VE's] testimony and the information of those sources" after the VE was sworn in but before he gave testimony. (R. 439.) At that point, "the [VE] [was] uncertain what [his] testimony [would] be" because "the VE ha[d] not heard the hypothetical(s) that will be posed and ha[d] not been questioned by the Plaintiff or Plaintiff's counsel." *Harris*, 2007 U.S.

Dist. LEXIS 96920 at *73. Therefore, the ALJ's procedure is contrary to the requirements of SSR 00-4p.

At the second step, if the VE's evidence appears to conflict with the DOT, the ALJ must "'obtain a reasonable explanation for the apparent conflict.'" *Overman*, 546 F. 3d at 463 (quoting *Prochaska*, 454 F.3d at 735). A conflict may exist, and the duty may arise, even if the claimant fails to raise the issue. *Overman*, 546 F. 3d at 463. But because this duty arises only where there is an *apparent* conflict, SSR 00-4p, the ALJ need not obtain a reasonable explanation unless "the conflicts [are] obvious enough that the ALJ should have picked up on them without any assistance." *Overman*, 546 F. 3d at 463.

Because the ALJ failed to satisfy the first step, the Court need not address whether there was an apparent conflict between the VE's testimony and the DOT. On remand, the ALJ must ask "if the evidence he or she *has provided* conflicts with information provided in the DOT" after the VE testifies. SSR 00-4p.


### 3. Evidentiary Basis of VE's Testimony

A vocational expert may testify as to the amount of jobs available for a particular individual "provided that the underlying data and reasoning are available on demand." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). The expert need not produce these data, however, where Plaintiff's counsel fails to question their genesis or reliability. *Id.* Only when the "vocational expert's conclusions [*are*] questioned . . . should the ALJ make an inquiry to find out whether the purported expert's conclusions are reliable." *Id.*; *see Overman*, 546 F. 3d at 465

(stating that "an ALJ may rely on imperfect VE testimony if a claimant does not question the basis for the testimony at the time of the hearing").

Plaintiff argues "the VE provided no support for any of his numbers and did not provide any support for his testimony on demand" and relies on *Donahue*, 279 F.3d at 446, for support. (Pl.'s Mem. in Supp. of Mot. Summ. J. 24.) But *Donahue* expressly refutes Plaintiff's argument, holding that data must be produced only when the vocational expert's conclusions are challenged at the hearing. *Donahue*, 279 F.3d at 446. The record does not evince, and the Plaintiff does not indicate, any instance where the VE's testimony was challenged.[7] Unlike the claimant's counsel in *Overman*, Plaintiff's counsel did not "[elicit] statements that seriously called into question the reliability of the VE's bottom-line conclusions." 546 F.3d at 464. Instead, although Plaintiff's counsel did conduct a limited cross-examination of the VE, Plaintiff's "counsel did not ask the [VE] about the genesis of the numbers or the reason for the discrepancy." *Donahue*, 279 F.3d at 446. Therefore, this Court rejects Plaintiff's claim the VE should have provided data to support the conclusions to which she testified.

---

[7] Plaintiff's attorney did ask if the VE had available the "DOTs and SVPs for [the general office clerk, bookkeeper, and accounting clerk]." (R. at 443.) This question, however, did not inquire into the genesis or reliability as to the number of those jobs that were available. Even if it had, the question was irrelevant as to the genesis or reliability of the numbers concerning the jobs the ALJ determined the Plaintiff could perform: inspector, checker, weigher, or assembler. Plaintiff's counsel never asked about the genesis or reliability of the number of these jobs.

## V.   Conclusion

For the aforementioned reasons, the ALJ's decision is affirmed in part, reversed in part,

and remanded for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: August 31, 2009.